Good morning judges. I will gavel in the session now. Thank you Stacey. The United States Court of Appeals for the Ninth Circuit is now in session. Good morning. I'm Judge Gould. Good morning. And I'm presiding today. And I'm delighted to be here with Judge Owens and Judge Forrest. We particularly appreciate the advocates helping us out in the time of coronavirus pandemic. And if any of you need a little extra time to argue, just let us know what you want and I'll try to give it to you. We only have one case here today. The case of Ervin v. Davis. And for the appellant, we've got Mr. Bryan. Yes, Your Honor. And Ms. Sayesani. Sayesani, Your Honor. And for the appellee, we've got Mr. Yanna. Good morning, Your Honor. Good morning. So the case is set for 30 minutes per side. Usually, even on complex cases, the excellent advocates we see are able to handle that. But again, if either of you need an extra several minutes, if any of you need that, just let me know. Thank you, Your Honor. So without further ado, we'll let the appellant proceed. And I'll also mention that the clock runs backward. And if the appellant wants to reserve time for rebuttal, it would be useful to stop before all the time is used up. And I guess we're dividing the argument. Yes, Your Honor. So who's first? I am, Your Honor. Okay, please proceed, Ms. Sayesani. Thank you, Your Honor. Good morning, and may it please the Court. Pamela Sayesani, counsel for Petitioner and Appellant Curtis Ervin. Also appearing on behalf of Ms. Ervin today is Robert Bryan, who will be addressing issue four. I will begin with first three. We would like to reserve five minutes for rebuttal taken from Mr. Bryan's time. This is a habeas case arising out of conviction from Alameda County, California, a conviction that was the result of misconduct and racial discrimination by the prosecutor as well as the jury. Beginning with issue one, Mr. Ervin's constitutional rights were violated when the prosecutor granted co-conspirator Armin Jack immunity for perjury. Mr. Jack, whom we allege is the actual killer, agreed to testify for the prosecution and pin the crime on our client in order to receive a get-out-of-jail-free card. The prosecution gave Mr. Jack immunity because they needed him to make their case. He provided the theory and motive for the crime. Jack was an admitted liar. He lied in his initial police interviews and during the plenary hearing, and we continued to lie at trial. The prosecutor gave him immunity for perjury. The law is clear. You can't give a witness immunity for lying in court. In denying relief, the state Supreme Court opined that the prosecutor intended to only give Jack immunity for his past perjury and not for his ongoing lies at trial. The state court was wrong. There was no ambiguity in the record. The prosecutor expressly said he would not go after Jack for any perjury committed in petitioner's trial. That's the only reasonable and logical conclusion to be drawn from the facts. Indeed, if the prosecutor went after its star witness for perjury, that would have unraveled the state's entire case. Thus, the immunity deal clearly covered any perjury throughout the trial. The state court's decision was thus contrary to law and an unreasonable determination of the facts. Petitioner is therefore entitled to relief on this claim. I will now jump to issue three, as that also concerns prosecutorial misconduct. The prosecutor committed a doubts and violation when he used his peremptory challenges in a racially discriminatory manner to remove virtually every African-American from the jury. Eleven black panelists made it to the jury box. The prosecutor removed nine of them, leaving one black male on the jury and one as an alternate. A comparative analysis, which was submitted to the Supreme Court, shows that the reasons the prosecutor gave for removing the black panelists were pretextual and disingenuous. Indeed, the prosecutor did not find objectionable white jurors who were similarly situated and kept them on the jury. Counsel, if I could jump in, because this is the issue that interests me the most, honestly. We alerted the lawyers about a New York Times article in 2005, which quoted the prosecutor, Mr. Anderson, making some, I'll just call them interesting statements about how the office would pick jurors. Is that article or the the facts underlying that article, was that ever made part of the record in this case, for example, before the district court in this case or the state, somehow in the state court proceedings? Has that ever been discussed in some way? No, your honor. That was neither in the state court or the federal court. And that was the case because the prosecutor concealed his discriminatory intent at trial and he continued to do so during the entirety of this litigation. So let me ask you this, because the Supreme Court in the Flowers case, which you brought to our attention, and we always appreciate lawyers doing that in the 20HA letter, Flowers lays out those bullet points. Justice Kavanaugh said, here are the things that courts have looked at to determine whether there's been a Batson violation. And it has those bullet points. You almost never see bullet points in Supreme Court opinions. So it kind of stuck out to me that they actually did it that way. And one of the things that Justice Kavanaugh wrote was the history of preemptory strikes by this particular office. I'm paraphrasing. That's what we do with that New York Times article in light of the Supreme Court's other decisions in cases like Cullen v. Pinholster, which restricts a federal court's ability to, in a sense, supplement the record with factual information. I take it none of this has been ever litigated in this case. You are correct, your honor. However, the Supreme Court's decision in Pinholster doesn't bar federal courts from using its evidence when doing so would promote the interests of justice. It was meant to bar habeas petitioners from abusing the process, from presenting new evidence in federal court that should have been presented in the state court. Here, petitioner was not at fault for the failure to present this evidence in the state court. The blame lies solely with the state, through its prosecutor, who concealed his discriminatory intent at and continues to do so today. In Martinez v. Bryan, the Supreme Court made an exception to Pinholster, stating that new evidence could be considered to evaluate whether petitioner's IAC claim should be procedurally defaulted. The court made this exception because it understood that petitioner should not be punished for his counsel's error. Following the Supreme Court's decision, this court has held, as in Jones v. Shin, that the Martinez procedural default exception applies to merits review of a petitioner's IAC claim, allowing federal habeas courts to consider evidence not previously presented to the state court. Thus, where petitioner is not at fault, requires consideration of this new evidence so that the court has all the relevant evidence before it. Indeed, had the prosecutor been as truthful and candid with the trial court as he was years later, the New York Times reporter, we wouldn't still be here today litigating this Batson claim. It would have been dealt with. Counsel, didn't the California court system determine that the prosecutor who made those statements was not truthful? Your Honor is referring to Mr. Quatman? Right. Who was the one who was quoted in the New York Times article? Well, yes, Jack Quatman was quoted in that article, but at the same time, the prosecutor, in this case, James Anderson, was also quoted in that article amidst his discriminatory intent. Indeed, as he told the New York Times reporter, of course, it is common sense. It is an axiom. We are not going to want black or Jewish people on our capital trials because, quote, they are not going to be on our side. That, Your Honor, is racist and reveals his discriminatory intent that he had when he, at Petitioner's Trial, made sure to exclude virtually every African-American from Mr. Irvin's jury. So let's say that that's true and that we can consider this information and the quote that he gave relates to his treatment of Jewish prospective jurors. What do we do with that in this case where the prospective jurors we're looking at were not Jewish? It's a different it's a different issue. Actually, Your Honor, in that New York Times article, Mr. Anderson did not limit his prejudicial comments towards Jewish people, but also African-Americans. He's told the New York Times reporter that he did not want either Jewish people or African-Americans serving on his jury. I think the language is if you have a cop case, be careful of blacks on the jury because they don't like cops. Is that the quotation you're referring to? I'm referring, Your Honor, to a quote from the article. James H. Anderson, a 35-year veteran of the office who retired last year as assistant district attorney for death penalty cases, said in a telephone interview that Mr. Anderson was not a racist because of backgrounds, professions and political beliefs. He was quoting that is not a racist thing, but just common sense. It is an axiom. It is not because of prejudice. Their politics are not going to be on your side. So it was clear from his statement to the New York Times reported that he also was talking about not only Jewish people, but African-Americans. Now, the district court did not have the benefit of this article, as far as we can tell. That's why I was asking you the questions about the record. The district court's analysis focused on really just the three of the nine jurors, and I didn't see the district court analyze the statistics that you brought up first. And I want to make sure I didn't miss anything. I'm correct that in the district court's order, it did not talk about the statistics. You are correct, Your Honor. As with the state Supreme Court, the district court failed to do the proper comparative analysis to determine whether this prosecutor actually engaged in discriminatory conduct. So let me let me ask you this, because the district court did not have the benefit of Flowers with the bullet points. And the court in Flowers made it clear that this is not a new this is not a new doctrine. This is kind of a summary of where we are. What is your position on this court sending this case back to the district court saying you did not have the benefit of Flowers? You need to apply the bullet points in Flowers, which is not merely looking at the three jurors. It's looking at all the jurors. It's considering the statistics. It's considering the history of this office. All those bullet points. What would be your position on whether we can do that? Your Honor, our position is that remand is not necessary because the cases have long held that in order to do a proper BATS analysis that you have to conduct a thorough comparative analysis. That was not done. The cases have already been established when the district court heard this case. Plus, when the proper resolution of an issue is not in doubt, there is no need to delay proceedings further and remand it to the district court. Doing so would be contrary to the interests of justice and efficient use of judicial resources. Well, let me let me ask you about that, because if I could just jump in this, it seems to me this New York Times article is really good for your side. OK, it's the same prosecutor in this case. If he had made these statements to the judge during jury selection saying, well, you know, I'm never going to put black guys. I mean, I don't think we would be here right now. The question, though, is that it's never really been litigated under pinholster. And I understand your arguments, but it's never been litigated as to whether we can consider this. And this is just a New York Times article. We don't have anything more than this. Now, I'm assuming there's all kinds of records in the state court litigation that Judge Forrest mentioned that would potentially bolster your case. But none of that is part of the record here. So if it's in terms of literally expanding the record to boost your case, we don't really do that on the court of appeals. That's more of a district court mechanism. So that's why I'm wondering, wouldn't you have a stronger case if you were allowed to expand the record, assuming you can? Yes, Your Honor. This court has broad, inherent, equitable authority to consider evidence of the New York Times article because, let's remember, it is the state that concealed this evidence to begin with. It is the state that withheld his discriminatory intent from the trial court and that the state continues to this day to not acknowledge that information. Petitioners should not be punished. Counsel, I'm sorry to interrupt you, but you've said that a couple of times, that the court has broad, equitable authority. I'm struggling with how I reconcile that with we're under AEDPA and AEDPA is a very tough standard of review for us. So how does the standard that you're arguing jive with this statute that we have to comply? Yes, Your Honor. As the Supreme Court in Martinez v. Ryan held, AEDPA does not serve as a blanket prohibition for this court to consider new evidence in the interest of justice. They made that exception, the procedural bar exception in Martinez, and this court has continued to make exceptions to consider the merits of an IEC claim. So an exception would be appropriate here, whereas the state that committed the misconduct. Also, this court has broad, equitable powers to remedy any constitutional violation. And here, Mr. Irvin's constitutional rights to a fair and impartial jury was denied by the state court's misconduct. So supplementation of the record is appropriate here without further delay. In addition, Federal Rules of Evidence 201 provides that at any stage of proceedings, a federal court of appeals may take judicial notice of matters that are not subject to reasonable dispute. In the Freeman case, as cited by Respondent in his supplemental briefing yesterday, the California Supreme Court referred to Mr. Anderson's comments from the New York Times article. Thus, his words are not in dispute. This court can therefore take judicial notice of the evidence. So why didn't you bring that up to the district court? I mean, this New York Times, we're talking about that because the court has raised that. Why didn't you raise that to the district court? Your Honor, we were not aware of it. We were not aware of this article and the contents of Mr. Anderson's discriminatory statement. However, the state was obviously aware, and it is their burden to correct the record because it is the state that concealed this evidence at trial. And as the state, knowing what the full evidence was, continued to argue incorrectly in litigation before the state court and this court that the prosecutor did not engage in discriminatory conduct when they knew, in fact, that he did based upon the New York Times article. They were in possession of this evidence from the beginning, and it was their duty to correct the record. Counsel, if I may just interject a question, I understand the argument that it's their duty to correct the record, but do we have to balance that against the fact that it's the appellant's duty here at Step 3 of Batson to prove that the strike was discriminatory? Yes, Your Honor, and we submit that the evidence that was already before the trial court had a proper comparative analysis been conducted proves that the prosecutor did engage in discriminatory conduct. The excuses that he gave for removing nine African-American panelists contradicted himself. He was all over the map in his explanation. Many of the reasons that he gave for removing black panelists applied equally to white jurors who he had no problems with. So the evidence, even without this New York Times article, is clear. He committed a Batson violation, and the trial court would have known that, and the state Supreme Court would have known that had they done the requisite comparative analysis as the Supreme Court requires. So another question I have is this, it seemed to me that the district court here was concerned regarding Ms. White, the strike of her, that she had answered that she was only going to follow the jury instructions partly, and she would partly decide based on what she heard in the penalty phase, and the district court here expressed the view that the prosecutor worried that by partly she meant that her religious convictions might or would prevent her from voting for death. The question I have is where did Judge Koh get that point? Was there something in the record of the four deer where Ms. White indicates that her convictions on religion would preclude this? I'm not aware, Your Honor. There were certain statements made by many of the jurors about their religious views or whatnot, and the prosecutor stated that he did not like jurors that possessed religious views because he felt that they would be against a death penalty. But as the record also shows, he kept jurors that were very religious, and in fact knocked out African-American jurors who were not religious, and obviously that showed his discriminatory intent. He simply was not consistent. I understand that argument, and you made that argument in your papers, but my question was specifically related to the use of the word partly by this witness, which the district court thought was significant and combined with her for whatever her religious motivations were. I was asking if the witness in Vordir, if Ms. White in her Vordir, had said anything that supports what the district court attributed to her. I don't recall, Your Honor. I don't recall if that was the case or not or how the district court came upon that conclusion. Okay. Thank you, counsel. Thank you. I see that my time is running out, but could I have a couple of minutes just to finish the last issue? Yes. Stacy, please have two minutes. Make your time two minutes. Thank you, Your Honor. Argument two concerns Mr. Irvin's constitutional rights being violated because of juror racial bias and misconduct. The evidence shows that some of the white jurors expressed racial views not only towards the petitioner, but also his defense counsel, both of whom are African-American. Some of the jurors mocked defense counsel's manner of speech. A male white juror, for example, admitted that he was irritated by counsel's, quote, ghetto talk, that it made counsel sound ignorant. And the jury said that he would recommend elocution lessons for counsel. The juror added that had counsel's pronunciation been different, it might have helped his client. Additionally, a female white juror held such apparent fear and bias of the black defendant that she imagined out of whole cloth that he had threatened a witness in the courtroom during recess. The problem was there was no threat. No witness claimed to have been threatened by the defendant, and indeed, the prosecution didn't allege any threats. She simply made it up in her head, and the juror carried that bias into guilt and penalty phase deliberations. The racial tension was particularly high during the penalty phase. The white jurors wanted the death penalty for Mr. Irvin, but wanted to spare the life of his white co-defendant, Mr. McDonald. The black juror, who was the sole holdout for life for Mr. Irvin, disagreed. He felt that Mr. McDonald was more culpable, and that if anyone deserved the death penalty, it was him. This impasse was finally broken when the jurors agreed to a sort of horse trading. The white jurors would return a death verdict for Mr. McDonald if the sole black juror would agree to the same for Mr. Irvin. The black juror relented only because he felt pressured to do so. Thus, Mr. Irvin's case was not found based upon the evidence, but by emotion and racial divide. Thus, he is entitled to relief on this claim. Thank you, Your Honors. I have one question about that. Can I ask a question? Go ahead, yes. Would you agree that without the Pena-Rodriguez rule that we could not get to those issues because they relate to the jurors' deliberative process? Yes, Your Honor. Pena-Rodriguez allows for the consideration of jury declarations in order to properly assess whether racial bias happens here, or whether a juror improperly considered extrinsic evidence as here. Right, so then this issue hangs on whether Pena-Rodriguez can be applied retroactively, right? Yes, Your Honor, but I believe in our briefing we did cite a series of cases where courts have routinely, the U.S. Supreme Court has routinely used declarations and other evidence to overcome a jury's verdict when it is based upon racial bias and other misconduct. Okay, thank you. Thank you, Your Honor. I will now turn the argument over to Mr. Bryan who will address Issue 4. Thank you. If it may please the Court, Issue 4, as the Court, I'm sure, is aware, deals with what we assert is prejudicial ineffectiveness of trial counsel in failing to investigate and present evidence at the penalty phase that their client suffered from organic brain damage, significant mental damage. This case is interesting, and this issue is particularly interesting because the trial attorneys admitted that they were ineffective, that they did not even investigate or probe into their client's mental state, even though they were well aware, well in advance of trial, that their client had mental illness. It was obvious to them just looking at him and talking with him that he was sick. They made a decision without any investigation to pursue that type of evidence to present at the penalty phase. They wanted to present what they felt was positive evidence, such things as his relationship with his family, his interest in music, that type of thing. By not pursuing an investigation into his mental state, which they recognized existed, the jury was not aware when they went back to make their life or death decision that they were dealing with a person, judging a person, who had what is viewed legally as a wealth of mitigating evidence, and that is that he had a history of mental illness that went back to his childhood, which was clearly the product, not only I'm sure, of some of it being inherited, but also the fact that he was exposed as a child to toxins in the air from a chemical plant near the Richmond neighborhood where Mr. Irving and his family lived. The toxic air was so severe that paint was peeling off of houses, paint was peeling off of cars. There was a yellow dust that settled in the neighborhood when the smoke was coming their way from the chemical plant. The result clearly was that it did great injury to people in the community. For example, the death rate in that Richmond community was much higher than the norm. The illness rate from, for example, lung-related illnesses was much higher than the norm, and the cancer and death rate were just extraordinarily high in that area, and the only difference between this neighborhood and others is the chemical plant that was nearby. The attorneys did present at the guilt base Dr. Fred Rosenthal, a forensic psychiatrist. However, even though the case had been pending four years, they did not bring him into the case until they were well into the guilt phase. He recommended that there be an investigation of Mr. Irving's background as to mental illness, social history, that type of thing. They chose not to do that because they did not have time. He also recommended a battery of psychological testing of Mr. Irving. That was not done because they made the decision that that was not necessary because they were not even going to consider presenting any evidence as to their client's mental state. When we came into the case years later at the post-conviction level, I got back in touch with Dr. Rosenthal and asked him. He explained that he had made recommendations to the attorneys that they pursue this investigation, that they have Mr. Irving evaluated not only by him, but also by others, and that that had been rejected. I asked him would he please, in post-conviction, do what he suggested that should have been done at the guilt phase before trial. That was done. Dr. Joan Cartwright, a psychologist, was brought in. She administered a battery of psychological tests, which clearly reflected that Mr. Irving suffered from mental illness and that he had organic brain damage. We also did a comprehensive investigation, which was not pursued during the pre-trial and trial phase of the case. That reflected that he had a history of brain damage from falling and hitting his head as a child, that he was abused as a child, the toxic chemicals in the air, as I mentioned, none of which had been presented at trial. We submit that the evidence is quite overwhelming, that the attorneys could not have made a task force or strategic decision to not present our proven mental illness evidence without an actual evaluation and without a thorough examination and investigation as recommended by Dr. Fred Rosenthal. The cases, both decisions by this court and the U.S. Supreme Court, make clear that investigation into the background of a person and the presentation of such evidence was mitigating, contrary to what the attorneys believed during the trial proceedings. The attorneys clearly had a duty to investigate and present evidence of mental impairment. Mr. Bryan, my question is, did you want to reserve some time for rebuttal? Absolutely, Your Honor, and I apologize for apparently going over. So we submitted S.S. to this issue. Well, I think the court would give you extra time if you needed it. I think I've covered it quite well, Your Honor. Pretty long argument as it is. Okay, so do you want to reserve the remainder of your time? Yes, we'd like to reserve, and Ms. Siason will make any rebuttal argument necessary. Well, who's going to make the rebuttal? Ms. Siason. Okay. Okay, that's fine. All right, thank you. Thank you, Your Honor. Okay, now I guess we've got Mr. Yano. Yano, Your Honor. Yes, Mr. Yano. Please proceed and... All right. May it please the court, I'd like to address the bad scenario that this court discussed first. Based on this court's letter, first of all, I want to point out that the statement that was in the New York Times is not a quote, it is a paraphrase. We don't have a transcript. We don't know exactly what he said. The appellate is trying to use Ms. Siason to paraphrase this as a basis for relief. Counsel, hold on. Hold on. Counsel, hold on. Because later in that article, there is a quote. I don't think we can dismiss it that quickly. Later in the article, Mr. Anderson is quoted as saying, when I was a young DA, he, the judge, would tell me, if you have a cop case, be careful of blacks on the jury because they don't like cops. That is a quotation from the article about Mr. Anderson. So let's not, I don't think you can dismiss it that quickly. All right. Well, that's, as far as I can tell, that was the only quote, but the statement where he talked about what he thought was a paraphrase. There was a substantial amount of what the district attorney said is a paraphrase. But the other point I want to make is this. Cullen v. Penholster and the ADPA have rules as to what this court may properly consider and what the district court may properly consider. Matters have to be within the state record, and they have to be, and the claims that he raises have to be exhausted. That means the factual basis has to be presented to the state court. If Mr. Ervin is denied relief here, then his, if he wants this article considered, his remedy is to try to present the matter in state court. He will file whatever he thinks is appropriate in state court. We will look at it. We will file whatever response we believe is appropriate. Then the state court evaluates it. But my understanding was that this has to go to the state court first before anything happens in the federal court. And once he, if he goes to the state court, he might get relief. He might not get relief. If he doesn't get relief, then he goes to this court. He raises whatever arguments he has. We raise whatever defense we have. So it's not, I don't believe this article is properly before this court. I believe that it's a matter that if he's going to be raised at all, it would have to be raised in state court. And then, just to clarify, I want to point out that I'm not feeding that the state court would give him relief. I'm just saying that any remedy is to be sought in state court, and we would file whatever we thought was appropriate in response to that. And that is, I think, a clear understanding of Cullen versus Penholster. It has nothing to do with the IAC issues that the opponent has raised. They don't even come into this. This is a pure argument on the Batson claim. So, and they, I am not aware of any U.S. Supreme Court that has said they can supplement the record on a Batson claim on something that was not presented to the state court. I believe that's a basic provision regarding exhaustion and Cullen versus Penholster. Now, in terms of the- Counsel, is one kind of following what you're saying there. If we were to send this case back to the district court, could the district court then stay proceedings in this case to allow petitioners to pursue this claim in state court? All right. My understanding is that if you send it back to the district court, then it puts an extra step into it, first of all. The other point is this. For him to get a state, my understanding of a state, is that the defendant has to ask for the state, and the defendant has to show, if he goes into exhaust, then the defense has to say why he didn't exhaust. Okay? So, the problem I would have with that is that he's asked for his relief now. He's not asked for a state. He's not asked for it to go back to the district court. He wants his relief now, and what I'm saying is that, and what we said in our brief, is that he hasn't shown a basis for relief based on bets. My position would be that any relief he would have to get would have to be first sought in the state court. Let me jump in there, counsel, and I appreciate what you're saying. The Supreme Court's decision in Flowers, and I understand your position that Flowers was direct review, not EDPA review, and that was from your letter, and I hear what you're saying there. But in Flowers, there's that, almost like a checklist, those bullet points instructing courts what they should look at, and I just want to make sure my understanding of the record in this case is correct. So, if you could just take a moment, I'm going to just review the bullet points with you as applied to this case. So, the first bullet point says that the defendant may present, and effectively the court should consider, statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors. I did not see the district court in this case consider the statistics. Am I correct about that? I believe that's correct, yeah. Okay, so then the second bullet point, go ahead. Can I answer something? Yeah. The California Supreme Court, when you look at the California Supreme Court's decision, or their ruling on the habeas corpus decision, you assume, based on Harrington, that they looked at everything, because you assume that you looked at every reason that they could have reached the conclusion they did. I appreciate that. All right, so then the second bullet point is evidence of a prosecutor's disparate question in an investigation of black and white prospective jurors in this case, kind of comparing the different types of questioning. I didn't recall the district court engaging in that analysis. I want to make sure I didn't miss anything. Not as far as I could tell. Okay. All right, then the next one is a side-by-side comparison of black prospective jurors who were struck and white prospective jurors. The district court did do that as to the three jurors. But, for example, as to Juror Hudnall, the NRA guy, I don't recall the district court. In fact, I think the district court said she was not going to analyze Hudnall because she didn't think it was properly presented by the defendant in this case. So as to jurors, I'll call them four through nine, including Hudnall, I did not see a comparison. Am I correct about that? You're right, but let me point out something. The district court responded to the arguments that were being made to it in the summary judgment proceedings. And as I recall, the summary judgment proceedings focused on the jurors as to whom a prima facie case was made. But I do want to point out, can I point out one other thing to this? And that is that when we look at the comparison of the questioning between jurors as if there was no prima facie case as compared to the ones who there was a prima facie case, what we're finding is, what this demonstrates to me is a weakness in the comparative analysis approach. Because when you look at district court questioning, you look at the same type of things. You see these jurors seem to be on paper similar to situated, but the judge who's there says, no, they're not similarly situated. And in some cases, he said, not even close. And defendants are arguing, oh, they're similarly situated. But the judge who's there said, no, there's some things that the judge could tell. And this is consistent with what was recognized in the Snyder case and what was recognized in the Cifuentes case, that the judge is there. The judge is seeing these things. So the judge is making a switch. And the Supreme Court has recognized the fact that that deference to the trial court's decisions is important. I just want to get through this checklist because I just want to make sure. Okay, sure. The prosecutor's misrepresentations of the record while defending strikes during the bets and hearing, I don't recall the district court looking at that. For example, saying Hudnall had a deeply religious bent, and I don't think that was accurate. Did the district court engage in that analysis? I recall that it did. As to jurors four through nine? No, I don't believe that the district court did. And then the relevant history of a state's peremptory strikes in past cases. Did the district court, for example, the New York Times article, did the district court engage in that level of analysis? No, but I'm glad you brought that up. Can I address that point? Yes. Because the defendant, in his reply brief, cites three cases that he complains about the prosecutor's use of peremptory challenges. Mason, Welch, and Brown. And in all three of those cases, the court found that the prosecutor did not violate Batson, that he had a legitimate reason for each of his challenges. So if we look at the history, the history is in favor of the state court's findings. I appreciate your argument. I'm asking, did the district court engage in that analysis? No, I don't believe so. So out of the one, two, three, four, five bullet points, and there's a sixth kind of catch-all, but of the five bullet points that the Supreme Court put in Flowers, the district court went 0 for five. Is that correct? Yeah. Okay, so if the district court goes 0 for five, shouldn't we send it back to the district court so it can get, I mean, zero out of five is zero out of five. Shouldn't we send it back to the district court so it can actually get those steps correctly? Look, it didn't have the benefit of Flowers, and I appreciate that. But in a capital case, when you get five out of five wrong, we usually don't say good to go. All right. Well, because my answer would be that you're reviewing the state California Supreme Court's decision. And when we look at what the district court has done here, look at what the district court found and what the California Supreme Court found. What we found is that the defendant did not make out its case. The defendant has come up with comparative analysis approach, and the only thing that they came up with, comparative analysis, and everything goes against it. And the comparative analysis is not in itself sufficient to carry the weight that the defendant is giving. It's a factor that you consider when you look at the whole spectrum. The biggest factor, the most important factor, is the trial court's credibility discrimination. And that, you know, the district court didn't go over five, but the district court went one, but the district court hit one run when it came to the, excuse the baseball analogy, but I think it emphasizes the difference. We're talking about criminal matters that you consider with other things. And the big thing is the number, the credibility determination. The other thing that I think our factors factor in, sure, but they're weak. I mean, the number, you know, his argument in the appellate brief was that, well, we looked at the strikes and we couldn't conclude that the numbers are happenstance. And our response is, well, of course it's not happenstance, because the prosecutor is selecting based on factors that are relevant to the kind of jurors that he wants. So if he's looking for the statistics, don't tell you very much, because all those jurors could have been, for legitimate reasons. Counsel, I want to follow up with your reference to the district court did a home run. I'm not sure that's right. So let's focus on Juror Hudno. I think I'm saying that right. I mean, like Judge Owens referenced a minute ago, it seems though the California Supreme Court affirmed the rejection of him for a reason that isn't supported by the record. The DA says this guy's really religious and I'm worried about his religious views, and it turns out in the record doesn't look really religious at all. So I don't know if that was the DA misremembering, maybe mixed up his notes, or he's coming up with a reason that's not legitimate. I don't really know. But the California Supreme Court doesn't address the fact that the record is not supportive of what the DA stated reason was. So you're right. We review the California Supreme Court's decision. That's where our standard of review focuses. So what do we do with that mistake? Well, what you do with that mistake is that you realize that Hudno was a juror to whom there was no prima facie case. And until we get to the court, the trial court made a finding about Hudno. I forgot the exact words. Maybe I'm mixing up the record. But I thought that the California Supreme Court decision basically assumed there was a prima facie case for all of them. And then went to the next part of the analysis. I would agree with that. They said that the trial court didn't say whether there was a prima facie case. Then the court said, well, then the court invites the prosecutor to give his reasons. And then the court says, I would find a prima facie case to those three. The California Supreme Court said, we're going to assume that the trial court found a prima facie case as to those three. But when we look at what the trial court found, it was trial court found a prima facie case as to Roberts, Knox, and there was one other one I put down here. Mullins. And they didn't find it. So that's what I would say. That's my response to that. It's that the court evidently saw something in Hudno that the prosecutor didn't even have to address. Something that the trial court found there. And so. I guess that answer doesn't make sense to me because the California Supreme Court decision specifically addresses Hudno and the religion issue. So if that court had previously said, well, as to that juror, there's no prima facie case, they wouldn't have needed to do that analysis. So I'm not sure that that makes sense. In any event, I mean, even before Flowers, we knew that where the record doesn't support a DA stated reason, we got a problem. We've got to look at and at least address. And it wasn't done. And so I guess I'm still left with what do we do with that? All right. Well, what I'm saying is that, well, all I can do is quote the, I don't have the trial court's exact words there. But I think that you have to defer to the trial court's finding. As far as I could tell, the trial court made a very clear finding that there was something about Hudno that was not even a prima facie case. So the California Supreme Court talked about Hudno, but they were talked about in the context of the trial court's findings. And the trial court's findings were that there was something about him. I mean, you don't even have to get to the prosecutor's reasons if there's no prima facie case. So I'm looking at what the trial court judge said as to Hudno. I'm looking at volume six of the ER 1264. Hudno, his answers were very confusing. As I recall, I didn't think we could get him to say how he'd vote on the death penalty. I think also he had some, I think he had a nephew charged with armed robbery last summer. I think that was back in the Midwest somewhere. Again, a satisfactory explanation as to his exercise as to that challenge. So the reason that the prosecutor gave was about religious, which is not accurate. And there was never a resolution of that at all. So, I mean, I understand deference to the trial judge. I mean, I was a prosecutor myself once upon a time making strikes in cases. But it doesn't seem like anyone ever said, well, hold on, Hudno, that's not right. He's not a religious guy. Like that was never clarified. To the extent we give the trial court deference, if the trial court was on the wrong direction because of the prosecutor's misrepresentation, then can we still give the trial judge deference in that situation? Well, the trial court found the confusion and made the statement about the arrest. I mean, if we look at the prosecutor's overall statements, he would have excused him simply for that reason. But the judge is saying, look, there's something about him that I can understand why he's objectively not a good juror for the prosecution. And compared to the other jurors, compared to what's available. So that would be my answer to that. I really, you know, I think we look at the fact that, you know, you defer to the trial court's findings as to what the trial court saw. And the trial court saw that this was not a good juror. So the prosecutor goes ahead and he gives reasons for striking it. But if it's not no prima facie case, then we don't even get to that inquiry of, you know, the validity of that particular assertion. So with that, can I proceed to the other issues that Epona's raised or should I stay with that or what would you, what would the court prefer? I have one other question before you move on that I'm trying to figure out. And I truly just don't know the answer. And I've been trying to figure it out. It seems from the record that the defendant made specific arguments as to each of the jurors in his petition. And then the state moves for summary judgment and he responds to summary judgment. And in that response, he makes specific arguments to some but not all of the jurors at issue that we were talking about. And so the district court said, you know, he doesn't make specific arguments. And so treats the ones that he didn't reference directly in his summary judgment briefing pretty summarily. And I want and what I can't figure out is in a typical civil case, the district court would be right that summary judgment, you don't just get to rely on your pleading document. But habeas is a little bit different. It's in the civil world, but it's a little bit different than that. So I would like to hear your argument on whether the defendant did enough to meet his burden in his response to summary judgment. Okay, as I recall, the arguments were on the three jurors to whom there were prima facie case. And again, I, you know, I think the district court was referring to the defense burden. I don't think the defense made out his his burden on showing that the prime of. Well, I don't think the defense made out his burden of showing that the court erred in finding no prima facie case. As to any of the jurors, as soon as found no prima facie case. I guess my question is maybe slightly different than what you're thinking. Can you point me to any legal authority that says that a defendant in responding to summary judgment can meet their burden by just referencing back to their petition? Is that okay to do in this context? Well, I'm sorry, the defendant can meet their burden by referencing back to the petition. I'm sorry, I don't. You're referring to we can meet our burden by. No, I'm asking about the defendant's burden. So I'll just lay that out again. So he makes really specific statements in his petition. State moves for summary judgment. He makes less specific arguments responding to summary judgment. And he just says, look back at my petition. I was more specific there. Oh, I see. Okay. Is there a legal authority to say that's good enough? As far as I know, I can't answer that one way or the other, Your Honor, off the top of my head. I think normally in summary judgment motions, you look at what's alleged rather than the petition. I'm sorry, I don't have the authority off the top of my head. Okay. Okay. All right. So let me. Counsel, if there's a motion on pleadings, you look at what was alleged. But I thought that on summary judgment motions, parties had to put in evidence by affidavit or otherwise. Well, the problem is with habeas corpus, your petition, you're limited to the state record. So he has to make his argument in the summary judgment motion. And our argument is would be any factual argument we would have made would have been based on state record. So I'm not sure I'm fully understanding your question, Your Honor. But my point would be we relied on the state record and that's what we're supposed to do. Thank you. Okay. All right. So let me go on to Mr. Herman Jack. Let me go on to Mr. Jack. I want to point out that this is a statewide issue. Our position is that it's a statewide issue. The scope of the immunity and what effect it has on anything, it doesn't present a federal issue. The defendant's argument is that it means that the state was that the condition was based on false evidence. But the fact is that no state court found that there was false evidence. In fact, the argument in the public brief goes back and forth between the original immunity and the expanded immunity. And without really clearly differentiating between the two. And I want to point out that the problem that they are really complaining about is the expanded immunity, which was given after Mr. Jack had substantially incriminated Mr. Herman. As to the juror declarations, what I do want to point out is that they really, even with Peña Rodriguez, I don't think they even come in. And Peña Rodriguez, of course, was long after the California Supreme Court's decision in this case. And the reason is that they don't show that racial discrimination played a role in the actual, the declarations don't show that racial discrimination played any role in the decision. It showed that the jurors disagreed as to culpability. They disagreed along racial lines, but they disagreed along racial lines based on the evidence and their views of culpability. The other statements went to juror thought processes, and they don't even fall within the very narrow range of prohibited conduct that Peña Rodriguez prohibits. In terms of the argument about ineffective assistance of counsel, oh, the other point about juror law here, again, we're talking about her thought processes. She saw something in open court. She heard the evidence that the witness had not been threatened, so she was not doing any kind of misconduct. She was simply responding to what she saw in court. She heard the evidence that the opponent says shows that the witness had not been threatened. She did not, there's no evidence she communicated her beliefs to anybody else. Okay, so the other point is the ineffective assistance of counsel claim. Excuse me. And my point is this, that Mr. Irvin had a very strong rehabilitation type claim. This case is not like the Andrus case and the Vena case that the opponent decided because in those cases the defense didn't put on anything. And here the defense put on a very strong case of potential for rehabilitation. In fact, Mr. Irvin was a relatively productive individual before he became involved in drugs. So a reasonable attorney could conclude, well, I'm going to pursue this and show that this is someone who, once he's off drugs, can be productive. And he presented quite a bit of evidence showing that. The other point is that the evidence that he did bring in from the examination in the state habeas corpus showed that Mr. Irvin was, you know, for whatever organic brain damage he might've had, he was, he could actually function pretty normally. He had an average IQ and he was actually above, I believe it was average or above average in some areas. So, and the other thing too is to remember is that this was not an impulsive crime. This was something that he had planned. It wasn't something that was subject to some delusion or some misplaced anger or anything like that. It was planned, it was thought out, he did it over a period of time, and then he collected the money and then he actually gloated afterwards. So, you know, he's dealing with, he's not dealing with what we might think is typical of the brain damage defendant who does something, who has a lifelong pattern of problems and who does something impulsive that reflects that brain damage. This was simply a case of where a substance abuse got the benefit of him. A reasonable attorney could conclude that once we get rid of the substance abuse, he can be productive. So, unless the court has anything else it wants me to address, I will submit it. Okay. Okay. Judge Bowens and Judge Forrest, if you have questions. Hearing nothing, I thank you, counsel. Thank you, Your Honor. We'll return to appellants for a battle argument. I think you're on mute. Thank you, Your Honor. I would like to briefly address some of the respondents' comments regarding, with respect to the Batson claim, the need for further delay with exhaustion. This court already has before it all the relevant information. It needs to rule on Mr. Irvin's Batson claim. As provided, the state court record already showed that the prosecutor possessed discriminatory intent. This court also has the power to consider the new evidence in the New York Times article because, as we have stated, it's only new because the prosecution concealed it all these years. Additionally, Mr. Irvin is not only entitled to relief on the Batson issue, he's entitled to relief on his first claim concerning the prosecution presenting false evidence through its key witness and then granting that witness immunity for perjury. Mr. Irvin's constitutional rights were also violated when the jury engaged in racial discrimination against him and considered evidence that was extrinsic to the case and thus biased his rights to a fair trial. All of these issues before the court entitled Mr. Irvin to relief now. Any further delay would be a miscarriage of justice to Mr. Irvin, who has already now spent almost 30 years this month on death row. Mr. Irvin was sentenced June 28, 1991. At all times, he has maintained his innocence. The facts before this court establishes by clear and convincing evidence that his constitutional rights were violated from the beginning to the end with the invalid jury verdicts. Petitioner, therefore, respectfully asks that the court render a decision now and grant the writ. Thank you, Your Honors. Thank you, counsel. Unless one of my colleagues has other questions. We'll thank all counsel for their help. Again, we really appreciate it during the current times. And I'm glad you could argue remotely. The court will therefore submit Irvin v. Davis now. The case is submitted and the counsel will hear from us in due course. Thank you. Thank you, Your Honor. Thank you, Your Honor. This court for this session stands adjourned.
judges: Gould, Owens, Forrest